**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PANAMA CITY DIVISION**

**CURTIS STRICKLAND,**

> **Plaintiff,**

**vs.**                                             **Case No. 5:10cv273-SPM/WCS**

**MICHAEL J. ASTRUE
Commissioner of Social Security,**

> **Defendant.**

_____/

**REPORT AND RECOMMENDATION**

This is a social security case referred to me for a report and recommendation pursuant to 28 U.S.C. § 636(b) and N.D. Loc. R. 72.2(D).  It is recommended that the decision of the Commissioner be affirmed.

**Procedural status of the case**

This case involves two applications made by Plaintiff, Curtis Strickland, under the Social Security Act.   Plaintiff filed an application for disability insurance benefits and also an application for supplemental security income benefits based on disability.  Doc. 21, p. 1.  His insured status for disability benefits expired on June 30, 2009.  R. 19.

Plaintiff alleges disability due to hepatitis C, a history of right carpal tunnel syndrome, status post release, a history of an intracranial injury, fibromyalgia, borderline

intellectual functioning, memory impairments, dysthymia, depression, anxiety, and chronic obstructive pulmonary disease.  Doc. 20, p. 2.  Plaintiff was 36 years of age on May 21, 2008, the date of the hearing.  *Id.*, pp. 2, 3.  He has a 12th grade equivalency education.  Doc. 21, p. 2 (R. 24, 74, 101, 297, 514).  Plaintiff reported past relevant work experience as a construction laborer.  Doc. 21, p. 2 (R. 24, 80-86, 97-98).

The Administrative Law Judge (hereinafter ALJ) found that Plaintiff has the residual functional capacity to perform a range of light work with postural, environmental, and mental limitations.  Doc. 21, p. 4 (R. 22).  The ALJ concluded that although Plaintiff cannot do his past work, he could perform other work which exists in significant numbers in the national economy and, therefore, is not disabled.

**Legal standards guiding judicial review**

This court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  "Substantial evidence is more than a scintilla, but less than a preponderance.  It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."  Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  "The Commissioner's factual findings are conclusive if supported by substantial evidence."  Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work

which exists in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).  A disability is an

"inability to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12

months . . . ."  42 U.S.C. § 423(d)(1)(A).  Both the "impairment" and the "inability" must

be expected to last not less than 12 months.  Barnhart v. Walton, 535 U.S. 212, 122

S.Ct. 1265, 1272, 152 L.Ed.2d 330 (2002).

The Commissioner analyzes a claim in five steps.  20 C.F.R. § 404.1520(a)-(f):

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or
       equal those listed in Appendix 1 of 20 C.F.R. Part 404?

4.     Does the individual have any impairments which prevent past
       relevant work?

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of

the application for benefits.  A positive finding at step three results in approval of the

application for benefits.  At step four, the claimant bears the burden of establishing a

severe impairment that precludes the performance of past relevant work.  If the claimant

carries this burden, the burden shifts to the Commissioner at step five to establish that

despite the claimant's impairments, the claimant is able to perform other work in the

national economy.  Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d 1050,

1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must prove

that he or she cannot perform the work suggested by the Commissioner.  Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

**Evidence from the administrative hearing**

Plaintiff said he did not have a driver's license because he did not have the

money to renew it.  R. 488.  Plaintiff said he had a GED, and could "read and write a

little bit," but said he was "not that good with math."  R. 489.  Plaintiff dropped out of

school and got married, and thought he was married "maybe three years," but he was

"not really sure."  R. 510.

He testified that he could not remember when he last worked.  R. 489.  He

thought his last job was working for Blountstown Truss.  R. 493, 495.  When asked why

he stopped working for Blountstown Truss, Plaintiff said he "just couldn't go no more."

R. 499.  Plaintiff said he stayed "about half sick all the time" and "[t]hey got tired of [him]

missing work."  *Id.*  He could also "remember doing block masonry and tying steel and

that was, I don't remember when that was neither."  R. 494.  Plaintiff was not employed

at the time of the hearing.  R. 495.

When asked why he could not work, Plaintiff answered, "I stay sick all the time

plus I got fibromyalgia."  R. 500.  Plaintiff also said he had "[h]epatitis C, high blood

pressure, depression, anxiety and RL9."  *Id.*  The ALJ seemed puzzled by the term

"RL9" and Plaintiff continued, "I think I, COPD or whatever that is."  *Id.*  Plaintiff reported

that he took several medications was "supposed to be on several others but I don't have

the money to pay for them so I haven't been taking them."  R. 503.

Plaintiff said his back gives him the "most pain but sometimes I get, it ain't all the

time but sometimes I get where I can't even ball my fist up."  R. 504.  Plaintiff reported

that his worst pain was in his neck and shoulder.  *Id.*  He said he has pain "[o]ff and on all day."  R. 504.  Plaintiff said the pain averages about an eight on a scale of one to ten with ten being the worst.  *Id.*  Plaintiff said "my legs kill me all the time and it's just, I can't explain it."  R. 505.  Plaintiff said his legs bother him most at night when he tries to "lay down" and he rated the pain as an eight.  *Id.*  Plaintiff said his doctor thought the cause of both the back pain and leg pain was fibromyalgia.  R. 505-506.

Plaintiff said he could only sit for "15 minutes maybe, if that" before he would have to stand up.  R. 506.  He thought he could only stand for "probably ten minutes" before needing to sit down.  *Id.*  Plaintiff could walk for "five minutes" but could not say how much he could lift or carry on a regular basis.  *Id.*

Plaintiff said that he was staying at a friend's house and he did not help with any housework or yard work or do any exercise.  R. 506-507.  Plaintiff said he watched television a "little bit."  R. 507.  Plaintiff said that if not for his friend, he would be homeless.  R. 512-513.

Plaintiff said he receives psychological treatment from Life Management in Blountstown, but could not remember whom he sees.  R. 508.  When asked how often he had treatment, Plaintiff said he "had a problem remembering dates and [he] missed [his] last appointment."  *Id.*  Plaintiff thought that he went once a month.  Plaintiff said that he had most recently seen Dr. Bryan,[1] a general practitioner, for his medical needs, R. 500-501, 503, but Plaintiff did not remember receiving treatment from Dr. Horvat, whom he saw twice for a consultative evaluation.  R. 511-512.

---

[1]  No medical records were presented for treatment by Dr. Bryan.

**Medical Evidence**

Plaintiff was treated for complaints of neck, shoulder, and back pain at the Keti Medical Center from February 18, 2000, through April 22, 2003.  R. 152-207.  Plaintiff also complained of anxiety and insomnia.  *Id.*  Plaintiff was initially prescribed Lortab for pain and later, Xanax for anxiety.  R. 203, 190, 154.  He was, at times, diagnosed as suffering from anxiety that came and went with pain.  R. 191, 188, 185, 164, 155.  Often there was no diagnosis of anxiety.  R. 205, 201, 194, 193, 181, 179, 178, 175, 174, 173, 172, 166, 165, 163, 161, 160.

Plaintiff also sought treatment from the Florida Department of Health from February 25, 2005, to May 23, 2005.  R. 208-217.  Plaintiff complained of feeling tired and weak.  *Id.*  He was diagnosed with anxiety and depression and prescribed Zoloft.  *Id.* and R. 210.  In April, 2005, Plaintiff complained that he was unable to eat, sleep or concentrate, and he wanted a note saying he could not work.  R. 209.  Plaintiff was given Advil for pain.  R. 208.  A notation in Plaintiff's medical records dated March 23, 2005, states that Plaintiff was hepatitis C positive and he was aware of that.  R. 211.

Plaintiff was seen in the Calhoun-Liberty Hospital several times for complaints of pain.  R. 218-219.  X-rays were taken on May 31, 2005 and May 24, 2005, showing no fractures.  *Id.*

On June 3, 2005, Plaintiff had a consultative examination with Dr. Iqbal Faruqui.  R. 221-224.  Plaintiff was "claiming disability mostly on the basis of upper back, neck and right shoulder pain."  R. 221.  Plaintiff had a history of carpal tunnel syndrome, and had had surgery for that condition, but still experienced pain and numbness in his right hand.  *Id.*  Plaintiff said that he also had been diagnosed with fibromyalgia and given

injections at trigger points in his neck, which "helped him for some time." *Id.*

Thereafter, he continued with Lortab and anti-inflammatory medicine for any recurring

pain. *Id.* Plaintiff was a long term smoker, having smoked "one pack per day since the

age of thirteen." R. 223. Plaintiff said he quit drinking six months earlier. *Id.* "Initially

he admitted to have drug use [sic] particularly injection drugs but later on he denied this

fact." *Id.* The records reflect that Plaintiff tested positive for hepatitis C and he reported

feeling "weak and tired" with little energy and frequent nausea. R. 222. Plaintiff

reported having had anxiety, depression, and panic attacks for years. *Id.* Plaintiff was

not taking any medications at that point, but said he was trying to get an appointment

with Life Management. *Id.* Plaintiff said he sometimes "wakes up at night with

shortness of breath, racing heart rate, choking feeling and other similar symptoms and

he wants to get counseling" for those problems. *Id.* Dr. Faruqui noted that Plaintiff was

"alert and oriented," and not in "any acute distress" but appeared "somewhat depressed

and has slow mentation." R. 223. Dr. Faruqui noted that Plaintiff had normal speech

and could "understand normal conversation," but he sometimes had problems

comprehending, and conversations had to be repeated. *Id.* Plaintiff's physical

examination revealed no spinal point tenderness, mild muscle tenderness in the right

upper and left lower back, minimal muscle spasm, full range of motion in all body joints

except the cervical spine, normal gait, grip strength and fine manipulation, with no motor

or sensory deficits, and only "some discomfort" with straight leg raising. R. 223-224.

Dr. Faruqui thought that Plaintiff should have a "GI consultant or a pathologist to

further evaluate" his hepatitis C and liver function as his liver enzymes were "grossly

elevated." R. 224. Dr. Faruqui thought Plaintiff would "probably also need a psychiatrist

to evaluate his anxiety, depression and panic attacks." *Id.* Nevertheless, Dr. Faruqui found that Plaintiff's examination was "basically unremarkable." *Id.*

Very late in the evening, on July 13, 2005, Plaintiff was admitted under Florida's Baker Act to the Life Management Center Stabilization Center. R. 282, 315-324. Plaintiff was admitted due to "an acute depressive state while intoxicated and he sustained superficial multiple laceration[s] on both his forearms." R. 282. He said he had not been previously hospitalized for psychiatric problems.[2] *Id.* Plaintiff "was depressed" and stated that he injured himself because he was mad with his wife and wanted to hurt her feelings. R. 283. It was noted that his judgment was "impaired" but his insight and concentration was "good" and his "intelligence [was] estimated to be about average." *Id.* Dr. Viola Taboada diagnosed Plaintiff with generalized anxiety disorder, noted his history of social phobia, chronic back pain, hepatitis C, and self-inflicted superficial lacerations on both forearms, stress due to marital conflict and physical limitations. R. 283-284. Plaintiff asked to be discharged to "go home and patch up with his wife." R. 283. Ativan was prescribed. R. 284. Dr. Taboada assigned Plaintiff a GAF (global assessment of functioning)[3] score of 60.[4] R. 283.

---

[2] Plaintiff told Dr. Vanterpool that he was committed under the Baker Act in 2000 in New Port Ritchie. R. 233.

[3] The GAF scale reports a 'clinician's assessment of the individual's overall level of functioning.' *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. 1994)." Sims v. Barnhart, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).

[4] "A GAF score of 51-60 indicates: "Moderate symptoms ( e.g., flat affect and circumstantial speech, occasional panic attacks ) OR moderate difficulty in social, occupational, or school functioning ( e.g., few friends, conflicts with peers or co-workers)." *See*, http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

Plaintiff was seen by Dr. Jocelyn Vanterpool on August 3, 2005, for a consultative psychiatric evaluation.  R. 233-236.  Plaintiff complained of depression, anxiety, feeling nervous, not being able to sleep, and problems with memory and concentration.  R. 233.   Plaintiff acknowledged depression "off and on" since 1997 and had had suicidal thoughts in the past.  *Id.*  Dr. Vanterpool noted:  "No other neural vegetative symptoms of a major depression reported."  *Id.*  Dr. Vanterpool said that Plaintiff had a history of depression, anxiety, and alcoholism, among other problems. *Id.*  He said he had taken a number of medications, including Xanax, Paxil, Prozac, Valium, Ativan, Klonopin, Effexor, Zoloft, Hydroxezine, Lexapro, Seroquel, Deseryl, Lithium, and, for pain, Ultram.  R. 233-234.  Dr. Vanterpool said that Plaintiff was alert and oriented, although "he did not know the date."  R. 235.  Plaintiff was dressed in jail attire, without cuffs, and was in jail for failure to pay child support.  R. 233, 235.  Dr. Vanterpool thought that Plaintiff had "[a]verage intellectual functioning" and his insight and judgment were "fairly intact."  R. 235.  Dr. Vanterpool found that Plaintiff's recent memory was decreased, but she also noted that his "[l]ong-term memory, remote, and immediately [sic] memory intact."  *Id.*  Dr. Vanterpool diagnosis was dysthymic disorder[5] with superimposed anxiety, nicotine dependence, and alcohol abuse and dependence; cluster B traits; and a history of hepatitis C, fibromyalgia, and chronic neck pain, related only by history.  *Id.*  Dr. Vanterpool assigned a current GAF score of 58-60, and prescribed Paxil.  Plaintiff was to follow-up in a month.  R. 235-236.

---

[5] Dysthymia (dysthymic disorder) is a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem). MEDLINE PLUS (MERRIAM-WEBSTER), found at: www.nlm.nih.gov/medlineplus/mplusdictionary.htm.

Plaintiff was sent to George Horvat, Ph.D., on a consultative basis on October 10, 2005, for psychological evaluation at the request of the Office for Disability Determination.  R. 237-240.  Plaintiff's chief complaints were depression, back injury, hepatitis C, emphysema, and fibromyalgia.  R. 237.  Dr. Horvat noted that while Plaintiff's "clothing was neat and clean," his "grooming and hygiene were neglected."  R. 238.  His girlfriend said that he did not sleep much at night, had lost interest in daily activities, and did not want to leave the house.  *Id.*  He and his girlfriend reported that he had attention deficit disorder symptoms, and reported that he would forget what he was currently doing.  *Id.*  Dr. Horvat said that Plaintiff showed "no signs of physical impairment, his posture and gait were normal, and his motor activity was not remarkable."  *Id.*  Plaintiff had no problems with attention or concentration, "but his memory was defective."  *Id.*  He was cooperative.  *Id.*  Plaintiff appeared to have below average intelligence based on his demonstrated verbal skills, and "he appeared to be capable of only simple decision making."  R. 239.  Dr. Horvat said that Plaintiff was "deficient in coping ability skills" and his "skill deficits appeared to be in the areas of intellect/education and activities of daily living," although Plaintiff "seemed to have the usual supports."  *Id.*  Dr. Horvat conducted a WAIS-III I.Q. test and reported that Plaintiff had a Verbal I.Q. of 64, a Performance I.Q. of 60, and a Full Scale I.Q. of 59, with low confidence levels from 56 to 70.  *Id.*  Dr. Horvat said that Plaintiff "showed poor motivation and limited work habits and easily gave up" on this test.  R. 240.  He said that Plaintiff "had poor concentration and attention" and "is operating at the .3 percentile level."  Dr. Horvat added that Plaintiff "would probably not have scored much better if he had been better motivated."  *Id.*  Plaintiff was diagnosed with pain disorder, dementia

due to head injury, and mild mental retardation.  *Id.*  Dr. Horvat's prognosis was that

with Plaintiff's "limited functioning memory and his limited intellectual ability, it is doubtful

that he can function in any gainful employment," but he "may be capable of routine,

repetitive, labor intensive types of work," but needed "careful supervision."  *Id.*  He

further indicated that if Plaintiff were found to be "entitled to SSI payments, it is felt that

with his limited memory functioning and his intellectual ability, he is probably not

capable of managing his funds."  *Id.*

On February 22, 2006, Plaintiff went to the Life Management Center of Northwest

Florida with complaints of extreme nervousness.  R. 286.  His anxiety was high, his

speech was pressured,  and he was very restless.  *Id.*  Plaintiff's "primary problem" was

noted to be alcoholism and the record indicated that "[b]asically he want's [sic]

benzodiazepines."  *Id.*  Plaintiff had only attended a few AA meetings, and complained

that Paxil, Inderal and Trazodone "don't do anything for his anxiety."  *Id.*

On February 23, 2006, Plaintiff went to the Emergency Room of the Calhoun

Liberty Hospital complaining of severe headache and "pains in neck."  R. 307-314.[6]  He

said the pain was sharp and aching, was eight on a scale of one to ten, and he had

suffered with the headache for three days.  R. 314.  He had also superficially lacerated

his forearms.  R. 317.  Plaintiff said he had gotten no relief from Tylenol or ibuprofen.  R.

308.  Plaintiff was given Ativan and Vicodin, and his lacerations were treated.  R. 316.

Plaintiff had another visit to Life Management on May 10, 2006.  R. 279-280.

Plaintiff complained that he continued "to feel anxious" and sought a change in his

---

[6]  Plaintiff's brief stated that Plaintiff was admitted to the hospital, doc. 20, p. 4, but
Plaintiff was sent home, not admitted.  R. 312.

anxiety medication.  R. 280.  His affect was flat and blunt.  *Id.*  Colleen Scudder, ARNP,

diagnosed Plaintiff with generalized anxiety disorder, depressive disorder (NOS), a

history of alcohol use, personality disorder (NOS), hepatitis C, hypertension, chronic

pain, and assigned a GAF score of 60.  *Id.*  She prescribed Vistaril and Trazodone, and

continued Prozac.  R. 281.

   Plaintiff returned to the Life Management Crisis Stabilization Unit on May 19,

2006.  R. 276.  This was Plaintiff's "third Life Management psychiatric evaluation."  *Id.*

Plaintiff said he "got into an argument with his girlfriend, he was drinking beer 5-6 drinks

as well as liquor, according to his chart he may have been taking a number of

Benzodiazepines."  *Id.*  Plaintiff was "severely intoxicated and his girlfriend called the

police."  *Id.*  Plaintiff threatened to shoot himself with a .22 rifle.  *Id.*  Prior diagnoses of

anxiety disorder and adjustment disorder were noted.  *Id.*   Dr. Paul Wurst examined

Plaintiff and diagnosed him with adjustment disorder, depressed mood, alcohol abuse,

hepatitis C, fibromyalgia, hypertension, and carpel tunnel syndrome, and assigned a

GAF score of 35.  R.  277.  Dr. Worst noted Plaintiff's behavior was "cooperative but

manipulative," his memory and concentration were "fair," and his insight and judgment

were "limited with denial of alcohol problem."  R. 277.  Plaintiff was admitted for "detox,

restart prior medicines," and observation for 24 hours.  *Id.*

   On June 1, 2006, Plaintiff returned to Dr. Iqbal Faruqui for another consultative

examination.  R. 295.  Dr. Faruqui said that Plaintiff was "claiming disability on the basis

of chronic back pain," but noted that he had other medical problems.  *Id.*  Plaintiff

related a history of back pain stemming from a work accident in 1997, a subsequent

diagnosis of fibromyalgia by Dr. Elzawahry, and then a diagnosis of hepatitis C, with no

money to pursue treatment.  *Id.*  Plaintiff reported that he "continued to have malaise and weakness and chronic pain syndrome particularly low back pain and upper back pain and [pain which] moves to [the] right side of the hip high [sic] and knee."  R. 296. Plaintiff said his pain is "worse with movement" and said that he is able to "stand for about thirty minutes and sit about thirty minutes and can walk about fifteen to thirty minutes and he cannot run."  *Id.*  Plaintiff said he could not sleep on his back due to pain.  *Id.*  Plaintiff said that he had worked in construction, but now could not do a heavy job and could not find an easy job.  R. 297.  Plaintiff was not depressed at that time, in no acute distress, with no muscle spasm or tenderness.  *Id.*  Plaintiff had normal grip strength and normal fine manipulation.  *Id.*  He complained of pain on movement and had "some stretching of muscle and low back pain."  *Id.*  Dr. Faruqui noted that Plaintiff was "seen in orthopedics and neurologist and apparently no abnormality was found."  R. 298.  Plaintiff's exam was "unremarkable as far as back pain [was] concerned" but Plaintiff was noted to "have dyspnea on exertion with pulse oximetry dropping to 85% on room air and pulse rate going up to one hundred and eighteen beats per minute."  R. 298.  Plaintiff was a chronic smoker of tobacco.  *Id.*  Dr. Faruqui opined that Plaintiff would need a pulmonary consult or have at least have a "PFT" (pulmonary functioning test) done.  *Id.*  He further believed Plaintiff should have a gastroenterology consult to evaluate Plaintiff's "liver problem and physical capacity assessment to evaluate his endurance."  *Id.*  Further, the records note that Plaintiff has "Hepatitis C for which a complete work up was not done due to lack of financial resources."  *Id.*

On July 11, 2006, Plaintiff a spirometry test (PFT), which indicated "moderate obstruction" and "COPD [chronic obstructive pulmonary disease] risk."  R. 299.  He had

an FEV1 score of 1.57. *Id.* It was noted that Plaintiff was a smoker, "20/day for 23 years." *Id.* Moderate obstruction was found to be indicated and risk of chronic obstructive pulmonary disorder (COPD) was noted. *Id.*

There next seems to be a gap in the medical records of about 18 months. On January 21, 2008, Plaintiff returned to Dr. Horvat for a second consultative examination. R. 447-450. Dr. Horvat said that he reviewed Dr. Vanterpool's reported dated August 3, 2005, but did not mention his own report dated October 10, 2005. R. 447. Dr. Horvat noted that Plaintiff's "clothing was neat and clean, but his grooming and hygiene were neglected." R. 447. *Id.* Plaintiff's "posture and gait were normal, and his motor activity was not remarkable." *Id.* "Severe tremors were observed in a perceptual drawing that was barely recognizable. His signature script was not legible, and he printed a simple sentence." *Id.* Plaintiff's "attention and his concentration were both normal, but his memory was limited as he missed two of three items after five minutes." R. 448. Plaintiff's "thought content was delusional," although he "showed no signs of preoccupations or hallucinations, and his organization was goal directed." *Id.* Plaintiff's attitude was cooperative, but his mood and affect were depressed. *Id.* Dr. Horvat again found that Plaintiff appeared to be below average in intelligence based upon demonstrated verbal and math skills. *Id.* "His abstraction was concrete, his judgment was commonsensical, his reality testing was distorted, his insight was nil, and his decision making was confused, but he has friends who help him to make decisions." R. 449. Dr. Horvat diagnosed Plaintiff with major depressive disorder, recurrent, medium,

and alcohol dependence, and assigned a current GAF score of 65.[7]  *Id.*  Dr. Horvat also found that Plaintiff was "capable of handling finances."  Dr. Horvat further stated that if Plaintiff "can be cleared physically to return to work, there are no psychological reasons why he could not do so."  R. 449-450.  Dr. Horvat noted that Plaintiff's psychological treatment program could be scheduled around his work commitments.  R. 450.

On February 23, 2008, Plaintiff was seen by Dr. Sandford Willliamson, D.O. for a social security disability consultative examination.  R. 469-472.  Plaintiff reported that Dr. Elzawahry had diagnosed fibromyalgia in 1995 based upon trigger points of pain, but he had not had any treatment for fibromyalgia since then.  R. 469.  Plaintiff said that he experienced pain all over, but especially in the neck, hips, and knees.  *Id.*  He said that his neck pain was improved with Ultram.  *Id.*  The examination revealed "an unkempt, well-developed, well-nourished male who is cooperative and does not appear acutely ill."  R. 470.  "Pain behaviors are not demonstrated" but there was "tremor with active movement of the upper extremities."  *Id.*  Plaintiff had full range of motion at the lumbar spine, but with "range of motion deficits at the cervical spine."  R. 471.  Dr. Williamson noted "pain response at the cervical spine with end range cervical spine rotation with extension."  *Id.*  There was also "[p]ositive cervical paraspinal tenderness."  *Id.*  Plaintiff had full range of motion of his extremities, with no pain or atrophy, but with positive tremor of the upper extremities when wrists and hands "are held in neutral."  *Id.*  "There is tremor at the lower extremities with active extension at the knees."  *Id.*  The

---

[7] A GAF score of 61-70 indicates: "Some mild symptoms ( e.g., depressed mood and mild insomnia ) OR some difficulty in social occupational, or school functioning (e.g., occasional truancy or theft within the household ), but generally functioning pretty well, has some meaningful interpersonal relationships."  *See* http://psyweb.com/Mdisord/DSM_IV/jsp/Axis_V.jsp.

straight leg raising test bilaterally was negative.  *Id.*  Plaintiff's strength was intact.  *Id.*

Plaintiff was diagnosed with non-radicular cervicalgia, multi-joint arthralgia with a

reported history of fibromyalgia, and tremor at the limbs with volitional activity.  R. 472.

**Legal analysis**

> **Whether the ALJ erred in failing to properly address Plaintiff's**
> **borderline intellectual functioning and why his depression and**
> **anxiety were not considered severe impairments**

The Administrative Law Judge found at step 2 that Plaintiff had the following

"severe" impairments: hepatitis C, untreated; a history of right carpal tunnel, status post

release; a history of intracranial injury that occurred while incarcerated in 2005; a history

of alcoholism; a history of tobacco abuse; a history of substance abuse; fibromyalgia;

and dysthymia.  R. 20.  Plaintiff argues that the ALJ erred in failing to find that Plaintiff's

borderline intellectual functioning, depression, and anxiety, were "severe" impairments.

Doc. 20, p. 10.  Plaintiff contends that the ALJ "failed to provide any reasons for

rejecting Dr. Horvat's assessment of major depressive disorder as well as Life

Management Center's diagnosis of generalized anxiety disorder and depressive

disorder."  *Id.*, p. 11.

At step 2, the issue is whether Plaintiff has shown that he has a condition which

has more than "a minimal effect on her ability to:  walk, stand, sit, lift, push, pull, reach,

carry, or handle, etc."  Flynn v. Heckler, 768 F.2d 1273, 1275 (11th Cir. 1985) (relying

on 20 C.F.R. § 404.1521).  "In other words, the 'severity' of a medically ascertained

disability must be measured in terms of its effect upon ability to work, and not simply in

terms of deviation from purely medical standards of bodily perfection or normality."

McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986).

"[I]n order for an impairment to be non-severe, 'it [must be] a slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience.' " Parker v. Bowen, 793 F.2d 1177, 1181 (11th Cir. 1986), *citing* Brady v. Heckler, 724 F.2d 914, 920 (11th Cir. 1984), Edwards v. Heckler, 736 F.2d 625, 630 (11th Cir. 1984), and Flynn, 768 F.2d at 1274.  "Step two is a threshold inquiry.  It allows only claims based on the most trivial impairments to be rejected.  The claimant's burden at step two is mild."  McDaniel v. Bowen, 800 F.2d 1026, 1031 (11th Cir. 1986) (clarifying Brady).  A "severe impairment" is a "de minimis requirement which only screens out those applicants whose medical problems could 'not possibly' prevent them from working."  Stratton v. Bowen, 827 F.2d 1447, 1452 n. 9 (11th Cir. 1987), *quoting* Baeder v. Heckler, 768 F.2d 547, 551 (3d Cir. 1985).  It also has been characterized by the Supreme Court as a criterion which identifies "at an early stage those claimants whose medical impairments are so *slight* that it is unlikely they would be found to be disabled even if their age, education and experience were taken into consideration." Stratton, 827 F.2d at 1452 n. 9 (emphasis by the court), *quoting* Bowen v. Yuckert, 482 U.S. 137, 153, 107 S.Ct. 2287, 2297, 96 L.Ed.2d 119 (1987).

An erroneous finding as to "severe" impairments at step 2 may improperly foreclose a claimant's "ability to demonstrate the merits of her claim for disability with respect to her former work activities."  Flynn, 768 F.2d at 1275.  Impairments must be evaluated in combination at all stages of the analysis.  20 C.F.R. §§ 404.1523 and 416.923; Lucas v. Sullivan, 918 F.2d 1567, 1574 (11th Cir. 1990); Swindle v. Sullivan, 914 F.2d 222, 226 (11th Cir. 1990); Davis v. Shalala, 985 F.2d 528, 534 (11th Cir.

1993).  Impairments must be evaluated in combination even though some impairments are not severe.  Hudson v. Heckler, 755 F.2d 781, 785 and n. 2 (11th Cir. 1985).  The Eleventh Circuit has "repeatedly held that an ALJ must make specific and well-articulated findings as to the effect of the combination of impairments when determining whether an individual is disabled."  Davis v. Shalala, 985 F.2d at 534.  On the other hand, even if there is error at step 2, a remand is not needed if the error was harmless because the ALJ considered the limiting effects of the impairment at each succeeding step, along with other impairments.  Riepen v. Commissioner of Social Sec., 198 Fed.Appx. 414, 415 (6th Cir. Oct 10, 2006) (not selected for publication in the Federal Reporter, No. 05-2407); Reed-Goss v. Astrue, 291 Fed.Appx. 100, 101 (9th Cir. Aug 25, 2008) (not selected for publication in the Federal Reporter, No. 07-35477); Newton v. Astrue, 2008 WL 915923, *10 (N.D. Ga. Apr 1, 2008) (No. CIV.A.1:06CV1542AJB).

     Even though Plaintiff's I.Q. scores, if valid, suggested mild mental retardation, Plaintiff does not argue that he is mentally retarded, but that he has borderline intellectual functioning, and that borderline intellectual functioning should have been among the "severe" impairments determined by the ALJ.  Plaintiff was evaluated first by Dr. Horvat on October 10, 2005, and Dr. Horvat said then that it was "doubtful" that Plaintiff could "function in any gainful employment."  Yet Dr. Horvat simultaneously thought that Plaintiff might be "capable of routine, repetitive, labor intensive types of work."  Further, although Dr. Horvat also found that Plaintiff's IQ numbers were low (verbal IQ was 64, performance IQ was 60, and full scale IQ was 59), he also found that Plaintiff "exhibited poor motivation and bad attitude," and did not "put forth a good faith effort" with testing.  Dr. Horvat's confidence level for this test was low, from 56 to 70,

though he speculated that the scores probably would have been the same even with more effort.

Dr. Horvat saw Plaintiff again on January 21, 2008.  Plaintiff was found to have limited memory and was thought to be "below average in intelligence," but for reasons unknown on this record, Dr. Horvat did not mention his own earlier I.Q. testing of Plaintiff.  He assigned a GAF score of 65, indicative of only mild problems.  Further, Dr. Horvat stated that he thought that there were "no psychological reasons why" Plaintiff could not work.

The ALJ determined that the earlier IQ tests were "not a valid representation of" Plaintiff's abilities as Plaintiff had "exhibited extensive adaptive functioning throughout his life."  R. 21.  The ALJ further noted that in the second examination, there was "no diagnosis of mild mental retardation or even borderline intellectual function present on this examination, clearly revealing the invalidity of the prior intellectual testing."  *Id.*  He determined that the second evaluation by Dr. Horvat and the evaluation by Dr. Vanterpool were more reliable indicators of Plaintiff's mental abilities than Dr. Horvat's first evaluation.  R. 24.  These findings are supported by substantial evidence in the record.  The ALJ did not selectively reference the medical records to support his decision, but relied upon the most recent testing as the most valid testing.  While the ALJ might have asked Dr. Horvat to clarify his opinion, drawing his attention to the earlier I.Q. testing, the record was sufficiently complete for the ALJ to determine that Plaintiff was not functioning at the mildly mentally retarded level, and to find that even a finding of borderline intellectual function was not warranted.  It was not error, therefore,

for the ALJ not to find that Plaintiff had the "severe" impairment of borderline intellectual functioning.

But even if this were error at step 2, the ALJ accounted for some mental functioning limitation at step 4, finding that Plaintiff is limited to simple, routine, repetitive tasks.  R. 22.  This is supported by what Dr. Horvat said on his first evaluation.  Step 2 error is harmless error if the limitations supported by substantial evidence in the record are considered at subsequent steps of the analysis.

It was also not error for the ALJ to fail to find that Plaintiff had the "severe" impairments of depression and anxiety since the ALJ determined that Plaintiff had the "severe" impairment of dysthymia, the diagnosis of Dr. Vanterpool.  A finding that Plaintiff suffers from dysthymia is a finding that Plaintiff has chronic mild depression or irritable mood often accompanied by other symptoms (as eating and sleeping disturbances, fatigue, and poor self-esteem).  R. 20 and footnote 4, *supra*.

Further, even if the ALJ had determined that Plaintiff had the "severe" impairments of depression and anxiety, substantial evidence exists in the record for his implicit determination at step 4 that Plaintiff's depression and anxiety are not significantly limiting factors.  Plaintiff had several visits to the Life Management Center, but none of those were of any extended duration.  They were brief treatments and related to Plaintiff's abuse of alcohol.  The medical notes from Plaintiff's May 19, 2006, admission reflect he was "severely intoxicated," drinking beer as well as liquor, and "taking a number of Benzodiazepines."  Dr. Wurst diagnosed Plaintiff with "adjustment disorder, depressed mood" and assigned a GAF score of 35.  However, Dr. Worst also

noted that Plaintiff's behavior was "cooperative but manipulative."  Plaintiff was admitted for "detox, restart prior medicines" and observation for "24 hours."

At no other time was Plaintiff assigned a GAF score that low.   Indeed, just nine days earlier, ARNP Scudder had assigned a GAF score of 60.  The only record evidence of Plaintiff's GAF score after that time was Plaintiff's second examination by Dr. Horvat in January, 2008, when a GAF score of 65 was assigned, indicative of only mild problems.

Plaintiff also asserts that it was error for the ALJ to "fail to mention, much less distinguish, the opinion of a State agency medical consultant who opined that [Plaintiff's] mental impairments were, indeed, severe impairments."  Doc. 20, p. 11, *citing* Exhibit 8F, p. 13 (R. 257).  Jane Cormier, Ph.D., rendered an opinion after review of the records, but without examining Plaintiff, on a "December 29, 20–."  The year is not legible on the record.  R. 245.  Dr. Cormier noted that Plaintiff had only mild restriction in activities of daily living, moderate difficulty in maintaining social functioning, concentration, persistence, or pace, and no episodes of decompensation of extended duration.  R. 255.  She found significant substance abuse history, noted that Plaintiff was briefly admitted following an altercation while Plaintiff was intoxicated and suffered self-inflicted lacerations, but found no evidence of ongoing mental health treatment.  R. 257.  She stated that while Plaintiff reported "memory and loss due to head injury and testing yielded significantly subaverage scores, he was noted to display 'poor motivation and a bad attitude' during testing."  *Id.*  Dr. Cormier also found that Plaintiff was "able to provide very detailed medical" history and found no evidence of cognitive impairment.  *Id.*  The final notation by Dr. Cormier states: "impairments severe but no listing is m/e."

*Id.* Dr. Cormier did not say which impairments were "severe," but the ALJ found that Plaintiff had the "severe" impairment of dysthymia.  His conclusion is not at odds with that of Dr. Cormier.  Further, even it were, the opinion of a non-examining physician is "entitled to little weight and taken alone does not constitute substantial evidence to support an administrative decision"   *See*, <u>Swindle v. Sullivan</u>, 914 F.2d 222, 226 n.3 (11th Cir.1990), *citing*, <u>Broughton v. Heckler</u>, 776 F.2d 960, 962 (11th Cir.1985).

**Conclusion**

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and correctly followed the law.  The decision of the Commissioner to deny Plaintiff's application for benefits should be affirmed.

Accordingly, it is **RECOMMENDED** that the Commissioner's decision to deny Plaintiff's application for disability and supplemental security income benefits be **AFFIRMED**.

**IN CHAMBERS** at Tallahassee, Florida, on September 8, 2011.

<u>s/    William C. Sherrill, Jr.          </u>
**WILLIAM C. SHERRILL, JR.**
**UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

Case No. 5:10cv273-SPM/WCS